Kuranda and wife, Respondents, v. O'Connor, Appellant.

*February 7—March 3, 1964.*

For the appellant there was a brief by *Lehner, Lehner & Behling* of Oconto Falls, attorneys, and *Ralph M. Lauer* of Clintonville of counsel, and oral argument by *Mr. Lauer.*

For the respondents there was a brief by *Nikolay, Jensen & Scott* of Abbotsford, and oral argument by *John J. Nikolay.*

DIETERICH, J.   The record reveals that on April 4, 1962, the parties executed the following agreement, which is a printed contract with some portions written in ink:

"SALES AGREEMENT.  This agreement entered into this 4th day of April, 1962, between F. M. O'Connor, broker, of Clintonville, Wisconsin, hereinafter called the broker, and Frank Kuranda of Loyal, Wisconsin, hereinafter called owner.

"Witnesseth: That the owner hereby employs the broker to conduct an auction sale of the following described real estate and personal property. . . .

"Said sale to be conducted on or about the 18th day of April, 1962, at 10:30 a. m., o'clock, under the conditions, and for compensation hereinafter set forth.

"1. The broker shall receive as compensation the sum of 10 percent of the total sale proceeds, including all items bid in by owner, or by anyone on his behalf, and shall receive said compensation out of the first monies received at said sale.

"2. The broker shall pay for the services of F. M. O'Connor who is hereby selected by the owner as auctioneer. The broker shall also pay for the services of the Wisconsin Finance Corporation who will act as clerk of said auction and will promptly make full settlement with the owner for all personal property sold, unless delayed by legal proceedings beyond their control.  Said finance company shall not be responsible for failure of bidders to consummate their purchases.  This instrument shall operate as a transfer of title to the finance company, on all items financed by said company. . . .

"6. . . . . It is also agreed that in the event the real estate cannot be sold on the day of sale, and is sold by the owner or broker within 90 days after said auction sale, the broker shall receive his full commission on said real estate, based on the actual sales price thereof. . . .

"8. The following space is provided for special agreements.  [The following appears in O'Connor's handwriting:]

"Seller is guaranteed in a minimum gross price for real estate and personal property of $45,000.  Commission over

and above that amount to be computed at 10 percent on personal property and 5 percent on real estate."

The testimony, while extremely sketchy, reveals that the auction was held; that respondents Kuranda and his wife received a total of $18,782.92 for the sale of personal property; [1] and that the real estate was not sold, but is still owned by the Kurandas. Frank Kuranda testified that the real estate was offered for sale, and that there were some bids on it. Kuranda also testified as to the additional damages alleged to have been suffered, and stated that since the contract was signed, he has paid $185 for insurance, $220 in taxes, and $700 interest. Kuranda's cross-examination brought out the fact that he had been renting the land in return for one half of the crops raised, and there was some testimony as to the market value of these crops. [2]

Mrs. Kuranda testified as to the following facts bearing on their damages: That they usually culled about 15 cows from their herd each year, which they sold for approximately $180 per head; that in 1961 their farm showed a gross profit of $12,500 and a net profit of $3,900; and that from December 31, 1961, to the time their cows were sold at the auction (April 18, 1962), their gross income from milk sales was $5,000. Mrs. Kuranda also testified that on September 17,

[1] While the parties and the trial court considered $18,782.92 as the sale price of the personal property, a "settlement sheet" from the Wisconsin Finance Corporation reveals that the "total of sale" amounted to $20,284.75. The contract between the Kurandas and O'Connor provided that Kuranda was to pay for the services of the finance corporation, who was to act as clerk of the auction and make settlement with Kurandas for all personal property sold. The settlement sheet shows a deduction from the total sale price of $1,501.83 for "commission," leaving a balance of $18,782.92, which is regarded by all as being the total sale proceeds.

[2] The testimony as to the crops was that Kuranda received about 1,000 bushels of oats, which were worth .57 per bushel, and about 2,980 bales of hay, which had a market value of $16 per ton (Kuranda testified that there are approximately 40 bales to the ton).

1962, she and her husband signed a warranty deed to the farm premises and tendered it to defendant O'Connor, and that O'Connor has never offered to pay the "balance due." The defense offered no evidence at the trial, and it was stipulated that the fair market value of the real estate at the time of the auction was $18,000.

The trial court found the following facts: That O'Connor agreed to sell the plaintiffs' real estate and personal property, guaranteeing them a minimum price of $45,000; that defendant did not sell the property as he agreed to do; and that there is a balance due and owing to plaintiffs in the sum of $26,217.08, less the value of the real estate ($18,000), and plus interest at the legal rate of five percent from the date the contract was breached [3] to the date of the trial, amounting to $175. The trial court also found that O'Connor was liable for the following damages suffered by plaintiffs between the date of the contract and the date of the breach: $110 taxes paid; $185 for insurance paid; $425 for loss of profits from the sale of culled cows; and $975 for loss of milk profits. O'Connor was given a credit for crops sold by the Kurandas in the sum of $1,762, resulting in total damages to the plaintiffs of $8,325.08 (the amount of the judgment). Plaintiffs were also given their costs and disbursements in the additional sum of $155.45.

The sole issue involved is whether the contract bound appellant O'Connor to sell the plaintiffs' personal property and real estate for a minimum price of $45,000.

The appellant argues first that the contract did not bind O'Connor either to buy the property himself or to sell the property for a minimum price—but that the only effect of the agreement was to make him the agent of the Kurandas for the purpose of conducting an auction sale, and that his

---

[3] The trial court determined that ninety days was a reasonable time in which to perform the contract and set the date of breach as being July 3, 1962—ninety days after the contract was executed.

power to sell the property was limited in that he could only sell for $45,000 or more.

The contract is entitled "Sales Agreement," and states that "the owner hereby employs the broker to conduct an auction sale . . . said sale to be conducted . . . under the conditions . . . hereinafter set forth." The "condition" in question is in O'Connor's handwriting, and states that the Kurandas are "guaranteed . . . a minimum gross price for real estate and personal property of $45,000. . . ." There is also a provision to the effect that if the real estate cannot be sold on the day of sale, and is sold by the owner or broker within ninety days, the broker, shall receive his full commission, based on the actual sales price of the real estate. The contract provides for payment of the broker's commission in the event that the property is sold for more than the $45,000, but no provision is made for either the broker or the owner in the event that the real estate is not sold—and this was the event that occurred. If the appellant's contentions were adopted, the handwritten provision guaranteeing the owner a minimum price of $45,000 for the real estate and personal property would be meaningless—unless this provision were interpreted to mean that the owner is guaranteed $45,000 *only if* everything is sold. If, as O'Connor claims, he was not agreeing to sell the property for a minimum figure, why would he add to the contract a provision that "the seller is guaranteed a minimum gross price . . . of $45,000?" The mere fact that such a clause was inserted into the contract indicates that it was intended that it should serve some purpose. See *Tollefson v. Green Bay Packers, Inc.* (1950), 256 Wis. 318, 322, 41 N. W. (2d) 201.

The situation presented is one where a contract, which, standing alone, appears clear and simple, is made ambiguous by the insertion of a provision seemingly at odds with the remainder of the agreement. Where a contract is ambiguous

it must be construed most strongly against the party who prepared it—in the instant case the defendant O'Connor. See *Strong v. Shawano Canning Co.* (1961), 13 Wis. (2d) 604, 609, 109 N. W. (2d) 355, and cases therein cited. It is equally clear that where written provisions of a contract are inconsistent with printed provisions, an interpretation is preferred which gives effect to the written provisions. Restatement, 1 Contracts, p. 328, sec. 236(e); *Atlantic Terra Cotta Co. v. Goetzler* (1912), 150 Wis. 19, 136 N. W. 188; *Tollefson v. Green Bay Packers, Inc., supra* (p. 322).[4]

In the light of the foregoing rules, we determine that appellant O'Connor guaranteed the Kurandas that their gross proceeds from the sale would not be less than $45,000, and that he did not fulfil the terms of the agreement.

Appellant also contends that the judgment of the trial court cannot stand because it is grounded upon an issue which was

[4] In *Tollefson v. Green Bay Packers, Inc.,* the plaintiff had signed a contract whereby he agreed to play football for the defendant team during the 1946 season. The printed form contract contained a salary provision to the effect that he would be paid at the rate of $300 "for each regularly scheduled league game played," and that for all other games his salary would be such as agreed upon between the parties. The words, "Minimum $3,600 for season" were inserted into the contract in the handwriting of the team manager. The plaintiff was given his release after he had played three practice games and one league game, and he commenced an action to recover the difference between the amount paid him and the $3,600 provided in the handwritten provision. He submitted his case solely upon the theory that the handwritten clause entitled him to payment of that amount regardless of performance on his part. This court held that the clause must be construed to mean that unless discharged for cause, plaintiff was entitled to the full sum of $3,600 whether he participated in the games played or not (p. 323). The opinion stated that the mere presence of the clause indicates that it was intended to serve some purpose, and, after finding it to be inconsistent with the printed salary provisions, this court applied the rule that where written provisions of a contract are inconsistent with printed provisions, the contract must be interpreted so as to give effect to the written provisions.

neither tendered nor litigated. His argument is that the only question litigated was whether O'Connor had agreed to purchase the plaintiffs' farmland, whereas the judgment was grounded upon the issue of whether O'Connor agreed to sell the property for a minimum price of $45,000. The complaint alleged that the parties "entered into a sales agreement," under the terms of which the defendant "was to pay to the plaintiffs the sum of $45,000 for their farm personal property and real estate . . ." and that "defendant has refused and neglected to complete the transaction." The essence of the complaint is that O'Connor breached the terms of the contract, which were incorporated into the complaint and made a part thereof. The relief granted by the trial court was in the nature of damages resulting from breach of the contract, and is consistent with the case made by the complaint within the meaning of sec. 270.57, Stats.[5]

The judgment of the trial court properly credited the defendant with $18,000, representing the value of the farm, and also with a figure representing the proceeds of the sale of the personal property. However, it is unclear whether the $18,782.92 figure regarded by the trial court as the personal-property-sale proceeds was the correct figure. Although the parties considered the sale price of the personalty to be $18,782.92, a "settlement sheet" from the Wisconsin Finance Corporation reveals that the "total of sale" amounted to $20,284.75, and shows a deduction from the "total of sale" of $1,501.83 for "commission," leaving a balance of $18,782.92, which figure was regarded by the parties as being the total proceeds of the sale. The basis in the record for the additional damages for taxes and insurance paid by the

---

[5] "MEASURE OF RELIEF. The relief granted to the plaintiff, if there be no answer, cannot exceed that which he shall have demanded in his complaint; but in any other case the court may grant him any relief consistent with the case made by the complaint and embraced within the issue."

plaintiffs, and for loss of profits from the sale of milk and culled cows is similarly unclear—as is the basis for the credit to O'Connor of $1,762 for sale of crops by the plaintiffs.

Also, the contract between the Kurandas and O'Connor provides for a commission of 10 percent of the total proceeds, and the record does not reveal whether or not O'Connor received any commission for the sale of the personalty. In any event, in determining the damages, O'Connor should be allowed a commission based upon the total agreed sale price of $45,000 and the judgment should show a credit to him for this commission in the sum of $4,500. Any commission received by O'Connor on the personal-property sale would be deducted from the $4,500.

The uncertainties as to damages outlined above must be resolved by a redetermination of the damage question in the trial court. We therefore affirm that part of the judgment finding defendant O'Connor liable under the contract, but reverse that portion of the judgment dealing with the damages, and remand the cause for further proceedings not inconsistent with this opinion, to the end that the plaintiffs' damages may be properly determined.

*By the Court.*—Judgment affirmed in part, and reversed in part. Cause remanded for further proceedings not inconsistent with this opinion.